James E. **GLUBA**, deceased, by Lorraine **GLUBA**, Relator,

v.

**BITZAN & OHREN MASONRY** and **Grinnell Mutual Group,** Respondents.

No. A06–1849.

Supreme Court of Minnesota.

July 26, 2007.

---

1. This example is not intended to convey that the commissioner has only one adequate legal remedy.

DeAnna M. McCashin, Schoep & McCashin, Chtd., Alexandria, MN, for Employee/Relator.

Dianne E. Walsh, Heacox, Hartman, Koshmrl, Cosgriff & Johnson, P.A., St. Paul, MN, for Respondents.

Lori Swanson, Attorney General, Jon K. Murphy, Assistant Attorney General, St. Paul, MN, for Minnesota Department of Labor and Industry.

## OPINION

ANDERSON, PAUL H., Justice.

James E. Gluba filed a workers' compensation claim petition with the Minnesota Department of Labor and Industry, alleging that he was permanently and totally disabled as a result of a work-related injury. A workers' compensation judge found that Gluba had a permanent partial disability of 10 percent and was unemployed and unemployable as a result of the injury. The judge nonetheless concluded that Gluba was ineligible for permanent total disability benefits under Minn.Stat. § 176.101, subd. 5(2)(c) (2006), which provides that a worker of Gluba's age and education must have a permanent partial disability rating of 13 percent or greater before permanent total disability benefits may be awarded. Gluba appealed to the workers' compensation court of appeals (WCCA), which affirmed the workers' compensation judge. Gluba then filed a second petition seeking permanent total disability benefits. The benefits were again denied by a workers' compensation judge. Gluba appealed this second denial to the WCCA, arguing, among other things, that section 176.101, subd. 5(2), is unconstitutional. The WCCA upheld the denial of benefits but declined to consider Gluba's constitutional claim. We granted Gluba's petition for further review of the constitutional claim. We hold that Gluba has not established that section 176.101, subd. 5(2), violates his right to equal protection.

Relator James E. Gluba of Evansville, Minnesota was born on May 8, 1928. He began working in the construction industry when he was 18 years old.[1] His first employer was Carlson Construction in Evansville, where he worked for more than 30 years. As a mason for Carlson and subsequent employers, Gluba laid bricks and blocks, the latter weighing from 20 to 75 pounds. In the 1980s, Gluba started his own masonry business. While self-employed, Gluba hired Dennis Bitzan and Terry Ohren to assist with one or more projects. In the early 1990s, Gluba tired of managing the books for his own business and began working for Bitzan and Ohren, who had subsequently formed their

---

1. Gluba died on May 30, 2005, from causes not related to his work injury, but his widow has continued to pursue his workers' compensation claims.

own business—Bitzan & Ohren Masonry. Gluba typically worked for Bitzan & Ohren Masonry from April through January, though work was sometimes available for him throughout the winter season. On November 26, 1996, Gluba, who was then 68 years old, slipped on an icy plank at a worksite and fell on his left hand and hip on a cement floor.

Shortly after his injury, Gluba sought chiropractic care from Dr. Richard Kastner for acute pain in his low back and left leg. Kastner concluded that Gluba had damaged his L5 disk, and imposed bending and lifting restrictions. In March 1997, Kastner released Gluba to return to work with no limitations, but in September he recommended that Gluba stop working because of continuing symptoms involving his L5 disk and left leg. Gluba changed chiropractors that same month and began receiving treatment from Dr. Darryl Moon for ongoing pain in his left hip and leg. At the request of Bitzan & Ohren Masonry's date-of-injury insurer—then called Grinnel Mutual Reinsurance Company—Gluba was examined by Dr. Richard Bailly, who ordered a CT scan and diagnosed, among other things, a herniated L5 disk. Bailly prescribed physical therapy and a work conditioning program for Gluba. Gluba was discharged from the conditioning program in March 1998 with a recommendation that he return to full-time work handling bricks, but not blocks.

Gluba returned to his job in the spring of 1998 and worked through the spring of 2001, after which time Bitzan & Ohren Masonry offered him no further work. That summer, Gluba secured intermittent employment with Olson Masonry, and worked his last day as a mason on September 3, 2001. Gluba had obtained periodic chiropractic care from Dr. Moon in 1998, 1999, and 2001. On November 19, 2001, Dr. Moon completed a Report of Work Ability in which he stated that as of November 19, 2001 and continuing for an indefinite period, Gluba was completely unable to work.

It appears that Bitzan & Ohren Masonry and its date-of-injury insurer (B & O, collectively) admitted liability for Gluba's 1996 injury and paid workers' compensation benefits from December 15, 1996 until September 3, 2001. On February 1, 2002, Gluba filed an Employee's Claim Petition with the Minnesota Department of Labor and Industry, alleging permanent partial disability (PPD) of 13 percent whole body impairment under Minn. R. 5223.0390, subps. 4.E and 4.E.(1),[2] and permanent total disability (PTD) from September 4, 2001 forward. In response, B & O asserted that, among other things, Gluba's 1996 work injury was no longer a substantial contributing cause of his disability.

A workers' compensation judge held a hearing on Gluba's petition on March 5, 2003 in Alexandria, Minnesota. The judge found that Gluba was "permanently and totally disabled as a result of his [1996] work related injury from September 4, 2001 through March 4, 2003," and that Gluba was "unemployed and unemployable" during the same period. The judge also found that Gluba's formal education extended only through the eighth grade, and that he had a seventh grade reading

**2.** Minnesota Rule 5223.0390, subp. 4.E, assigns a PPD rating of 10 for radicular pain or radicular paresthesia associated with spinal stenosis that impinges on a lumbar nerve root. Rule 5223.0390, subp. 4.E(1), adds a PPD rating of three when chronic radicular pain or radicular paresthesia persists despite treatment. Gluba ultimately argued to the workers' compensation judge that his PPD was greater than 13 percent, apparently in light of a February 8, 2002 letter in which Dr. Bailly concluded that Gluba's PPD rating was 22 percent whole body under Minn. R. 5223.0390 and two of its subparts.

capability, a fourth grade spelling capability, and below "normal" scores in "numerical abilities." The judge stated that Gluba had "performed masonry throughout his entire life" and concluded that Gluba had "few vocational transferable skills" and lived "in an economically depressed area with a general labor market [that] has been described as 'very, very tough.'" Finally, the judge found that Gluba had a 10 percent PPD, of which his work-related injury was a substantial contributing cause.

Based on the foregoing finding, the workers' compensation judge concluded that Gluba had not met the threshold to qualify for PTD benefits under Minn.Stat. 176.101, subd. 5(2)(c) (2006), which requires that a worker of Gluba's age and education have a PPD rating of at least 13 percent before PTD benefits may be awarded. Therefore, the judge denied Gluba's claim for PTD benefits from September 4, 2001 to March 5, 2003 but ordered B & O to pay Gluba PPD benefits commensurate with 10 percent whole body impairment.[3] Gluba appealed the judge's order to the Workers' Compensation Court of Appeals (WCCA), which upheld the denial of PTD benefits.

Gluba did not appeal the WCCA's decision, but rather filed a second claim petition on May 7, 2004. In this second petition, Gluba again alleged PTD as of September 4, 2001. He also alleged PPD of 9.25 percent whole body under Minn. R. 5223.0420, subps. 4, 5.[4] The workers' compensation judge held a hearing on this petition on December 14, 2005. At this hearing, Gluba introduced a letter from Dr. Kurt Hansberry, who assigned Gluba an additional five percent whole body PPD rating for a bladder condition under Minn. R. 5223.0600.[5] The judge found, among other things, that Gluba's claim for PTD benefits from September 4, 2001 through March 5, 2003 was barred by the doctrine of res judicata. The judge also found that although Gluba's claim for PTD benefits as of March 6, 2003 was not procedurally barred, the evidence did not support a PPD rating of greater than 10 percent. Accordingly, the judge concluded that Gluba failed to meet the threshold for receiving PTD benefits under section 176.101, subd. 5(2)(c).

Gluba appealed the denial of his second claim petition to the WCCA, arguing that the workers' compensation judge erred when he denied Gluba's PTD claim. Gluba also argued that the threshold requirements of section 176.101, subd. 5(2), are unconstitutional. The WCCA affirmed the workers' compensation judge with respect to the PTD claim but concluded that it lacked jurisdiction to consider Gluba's constitutional argument and therefore did not address this argument. Gluba then petitioned our court for review of whether

3. The judge set March 5, 2003 as the end date for disability benefits based on his conclusion that Gluba had effectively withdrawn from the labor market as of that date and therefore, Gluba's 1996 work injury was no longer a substantial contributing factor to his unemployed and unemployable status. The WCCA ultimately reversed this conclusion, which is not relevant to this appeal.

4. In combination with one another, subparts 4 and 5 of Minn. R. 5223.0420 assign a PPD rating of 9.25 to a person who has a 4/5 strength grade in muscle groups supplied by injured third, fourth, and fifth lumbar nerve roots.

5. *See Frankhauser v. Fabcon, Inc.,* 57 Minn. Workers' Comp. Dec. 239, 252 (WCCA) (holding that a worker may include a ratable PPD from any cause—including non work-related injuries or conditions—in his total PPD rating in order to meet a section 176.101, subd. 5, threshold), *aff'd without opinion,* 569 N.W.2d 533 (Minn.1997).

section 176.101, subd. 5(2), violates injured workers' equal protection rights under the U.S. Constitution or the Minnesota Constitution.

■■■ We review a statute's constitutionality de novo. *ILHC of Eagan, LLC v. County of Dakota,* 693 N.W.2d 412, 421 (Minn.2005). We presume statutes to be constitutional and exercise our power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. Id. "The party challenging the constitutionality of the statute bears the burden of establishing beyond a reasonable doubt that the statute violates a constitutional right." *Westling v. County of Mille Lacs,* 581 N.W.2d 815, 819 (Minn. 1998) (quotation marks omitted).

The Fourteenth Amendment to the U.S. Constitution guarantees that no state will "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Minnesota Constitution likewise guarantees that "[n]o member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. I, § 2. We have stated that "[b]oth clauses have been analyzed under the same principles and begin with the mandate that all similarly situated individuals shall be treated alike, but only 'invidious discrimination' is deemed constitutionally offensive." *Kolton v. County of Anoka,* 645 N.W.2d 403, 411 (Minn.2002) (quoting *Scott v. Minneapolis Police Relief Ass'n,* 615 N.W.2d 66, 74 (Minn.2000)).

*Level of Constitutional Scrutiny*

■■■ If a constitutional challenge involves neither a suspect classification nor a fundamental right, we review the challenge using a rational basis standard under both the state and federal constitutions. Id. Minnesota Statutes § 176.101, subd. 5, the statute that Gluba asserts is unconstitutional, states that

"permanent total disability" means only:

(1) the total and permanent loss of the sight of both eyes, the loss of both arms at the shoulder, the loss of both legs so close to the hips that no effective artificial members can be used, complete and permanent paralysis, total and permanent loss of mental faculties; or

(2) any other injury which totally and permanently incapacitates the employee from working at an occupation which brings the employee an income, provided that the employee must also meet the criteria of one of the following clauses:

(a) the employee has at least a 17 percent permanent partial disability rating of the whole body;

(b) the employee has a permanent partial disability rating of the whole body of at least 15 percent and the employee is at least 50 years old at the time of injury; or

(c) the employee has a permanent partial disability rating of the whole body of at least 13 percent and the employee is at least 55 years old at the time of the injury, and has not completed grade 12 or obtained a GED certificate.

For purposes of this clause, "totally and permanently incapacitated" means that the employee's physical disability in combination with any one of clause (a), (b), or (c) causes the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income. Other factors not specified in clause (a), (b), or (c), including the employee's age, education, training and experience, may only be considered in determining whether an employee is totally and permanently incapacitated after the employee meets

the threshold criteria of clause (a), (b), or (c). The employee's age, level of physical disability, or education may not be considered to the extent the factor is inconsistent with the disability, age, and education factors specified in clause (a), (b), or (c).

Gluba asserts that the PTD thresholds set forth in subdivision 5(2)(a)-(c) above implicate two suspect classifications: age and disability. He also asserts that the thresholds violate the fundamental right "to live where one chooses."

With respect to Gluba's first assertion, we have stated that "[i]t is well settled that legislative classifications based upon age are not suspect classifications" for equal protection purposes. *In re Estate of Turner*, 391 N.W.2d 767, 769 (Minn.1986). Similarly, courts have not subjected classifications based on disability to heightened scrutiny. *See Tennessee v. Lane*, 541 U.S. 509, 522, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) ("[C]lassifications based on disability violate [equal protection] if they lack a rational relationship to a legitimate governmental purpose."); *see also Kolton*, 645 N.W.2d at 411 (applying rational basis review to a classification based on disability when neither party argued for heightened scrutiny).[6]

Further, we do not find persuasive Gluba's additional assertion that section 176.101, subd. 5(2), violates the fundamental right "to live where one chooses."

Gluba appears to contend that by denying PTD benefits to injured workers who are unemployable in the communities where they live, the thresholds of section 176.101, subd. 5(2) may "force" such workers to leave their hometowns in order to seek work in healthier job markets. The U.S. Constitution prohibits the legislature from burdening a fundamental right absent a compelling governmental interest. *See, e.g., Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 269, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). But in this case, we conclude that any burden section 176.101, subd. 5(2), may place on a worker's right to live where he chooses—to the extent this right is recognized as "fundamental"—is too attenuated to trigger the heightened scrutiny that Gluba seeks.

The foregoing conclusion finds support in United States Supreme Court case law. In *Bowen v. Gilliard*, the Court declined to apply heightened scrutiny to an Aid to Families with Dependent Children amendment that allegedly burdened the fundamental right of families to determine their own living arrangements. 483 U.S. 587, 601–03, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987). In support of its decision to apply rational basis review, the Court reasoned that legislation that could *indirectly* affect families' choices with respect to living arrangements is distinguishable from legislation that would "directly and substantially" interfere with such choices. Id. (quoting *Lyng v. Castillo*, 477 U.S. 635, 638, 106

---

6. Gluba argues that because persons with disabilities are a protected class under the Minnesota Human Rights Act (MHRA), Minn. Stat. ch. 363A (2006), we should treat such persons as a suspect or quasi-suspect class for equal protection purposes. But the authority Gluba cites for this proposition, *Karst v. F.C. Hayer Co., Inc.*, 447 N.W.2d 180, 185–86 (Minn.1989), is inapposite. In *Karst*, we held that a worker who receives disability benefits from a former employer under the Workers' Compensation Act cannot sue that employer under the MHRA for refusing to rehire him because of his disability. 447 N.W.2d at 186. Moreover, *Karst* has been at least partially abrogated by statute. In 1995, the legislature amended the Workers' Compensation Act to allow civil actions by workers against employers for refusal to offer continued employment "when employment is available within the [worker's] physical limitations." Act of May 25, 1995, ch. 231, art. 1, § 30, 1995 Minn. Laws 1996 (codified at Minn.Stat. § 176.82, subd. 2 (2006)).

S.Ct. 2727, 91 L.Ed.2d 527 (1986)). Here, Gluba has not established that section 176.101, subd. 5(2), directly and substantially interferes with a fundamental right. Absent such a showing—and because neither age nor disability is a suspect classification—we conclude that section 176.101, subd. 5(2), is subject to rational basis review.

### Rational Basis Review

 When applying rational basis review under the Equal Protection Clause of the Fourteenth Amendment, we inquire "whether the challenged classification has a legitimate purpose and whether it was reasonable [for the legislature] to believe that use of the challenged classification would promote that purpose." *Kolton,* 645 N.W.2d at 411. But when we apply rational basis review under art. I, § 2 of the Minnesota Constitution, we have sometimes applied a "higher standard." *See Kahn v. Griffin,* 701 N.W.2d 815, 831 (Minn.2005); *see also Mitchell v. Steffen,* 504 N.W.2d 198, 210 (Minn.1993) (Tomljanovich, J., dissenting) (likening Minnesota's approach to rational basis review to "mid-level" scrutiny). This higher standard—often characterized as the Minnesota rational basis test, *see Scott,* 615 N.W.2d at 74—requires that:

> (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that

the state can legitimately attempt to achieve.

*State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991) quoting *Wegan v. Village of Lexington,* 309 N.W.2d 273, 280 (Minn. 1981). "The key distinction between the federal and Minnesota tests is that under the Minnesota test 'we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires.'" *State v. Garcia,* 683 N.W.2d 294, 299 (Minn.2004) (quoting *Russell,* 477 N.W.2d at 889).

 We have generally assessed the constitutionality of workers' compensation statutes using a formulation of rational basis review that echoes the Minnesota test's terminology and three-prong structure:

> To survive [an equal protection] challenge, a [workers' compensation] classification must apply uniformly to all those similarly situated; be necessitated by genuine and substantial distinctions between the two groups; and effectuate the purpose of the law.

*Bituminous Cas. Corp. v. Swanson,* 341 N.W.2d 285, 287 (Minn.1983) (quoting *Nelson v. State, Dep't of Natural Res.,* 305 N.W.2d 317, 319 (Minn.1981)); *see also Alcozer v. N. Country Food Bank,* 635 N.W.2d 695, 705 (Minn.2001) (applying the same three-prong structure). But for reasons set forth later, we do not interpret this formulation as implicating the "higher standard" of rational basis review that we applied in *Russell.*

Applying the foregoing formulation, Gluba argues that (1) all injured workers who are permanently unable to secure or maintain gainful employment are similarly situated; (2) the differences among such workers in terms of age and educational attainment, and especially, PPD ratings, are not "genuine and substantial" distinctions necessitating different treatment for

similarly-situated workers; and (3) the PTD thresholds do not effectuate the purpose of the workers' compensation law, which is to compensate permanently disabled workers for lost wages. B & O argues that (1) the PTD thresholds apply uniformly to all injured workers seeking PTD benefits; (2) the thresholds are necessitated by genuine and substantial distinctions between older, less educated workers and younger, more educated workers; and (3) the thresholds effectuate the workers' compensation law by facilitating objectivity and efficiency in the awarding of PTD benefits.

*Do the classifications in Minn.Stat. § 176.101, subd. 5(2) apply uniformly to all similarly situated persons?*

As B & O argues, the classifications in this case—that is, the thresholds for PTD benefits under section 176.101, subd. 5(2)(a)-(c)—apply uniformly to all workers whose injuries occurred after October 1, 1995. Act of May 25, 1995, ch. 231, art. 1, § 21, 1995 Minn. Laws 1990–91 (amending section 176.101, subd. 5(2)); *see also* § 37, 1995 Minn. Laws at 1999 (setting an effective date of October 1, 1995 for the amendment).[7] While Gluba asserts that we should focus on the similarly-situated nature of all workers injured after October 1, 1995 *who are permanently and totally unable to secure gainful employment,*[8] it is unclear how this focus would change the outcome of the first step in our equal protection analysis. More precisely, just as the thresholds for PTD benefits apply uniformly to all injured workers, they apply uniformly to all workers who

may in fact be permanently and totally unemployable.

No employee—regardless of how severely his impairment may limit his wage-earning capacity—is eligible for PTD benefits unless his impairment is among those listed in section 176.101, subd. 5(1), or he meets one of the statutory thresholds. *See Metzger v. Turck, Inc.,* 59 Minn. Workers' Comp. Dec. 229, 238 (WCCA 1999) ("[U]nder the 1995 amendments [that established the thresholds], eligibility for permanent total disability benefits is for the first time dependent on some specified level of permanent partial disability."). We therefore conclude that the classifications set forth in section 176.101, subd. 5(2) apply uniformly to all similarly situated persons.

*Are subdivision 5(2)'s classifications necessitated by genuine and substantial distinctions among injured workers?*

Gluba also argues that the PTD thresholds established by subdivision 5(2) are not necessitated by genuine and substantial distinctions among injured workers. More particularly, Gluba argues that the thresholds are arbitrary because they condition eligibility for PTD benefits on factors not rationally linked to employability. B & O argues that the thresholds are necessitated by genuine and substantial distinctions between older, less educated workers and younger, more educated workers and among workers with varying degrees of physical impairment.

As previously noted, the formulation of rational basis review that we use in

7. The law in effect on the date a worker is injured governs the benefits that worker is eligible to receive. *See Joyce v. Lewis Bolt & Nut Co.,* 412 N.W.2d 304, 307 (Minn.1987).

8. Gluba asserts that the effect of the PTD thresholds is to treat unequally all workers who are "permanently and totally disabled." It is important to note that "permanently and

totally disabled" in the context of the workers' compensation system is *a legal status* defined by the legislature. Therefore, contrary to the assumption underlying Gluba's assertion, workers cannot be characterized as permanently and totally disabled unless they first meet the statutory thresholds.

workers' compensation cases shares some common features with the Minnesota rational basis test. But we decline to infer from that formulation's language or three-part structure that we are to apply a "higher standard" than federal rational basis review to the classifications at issue here. We have consistently concluded that "it is proper to defer to the legislature in matters 'concerning the desirability of statutory classifications affecting the regulation of economic activity and the distribution of economic benefits.'" *Alcozer*, 635 N.W.2d at 705 (quoting *Tibbetts v. Leech Lake Reservation Bus. Comm.*, 397 N.W.2d 883, 890 (Minn.1986)). For example, we will uphold tax-related classifications unless the challenger proves that "'the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" *Council of Indep. Tobacco Mfrs. of Am. v. State*, 713 N.W.2d 300, 308 (Minn.2006) (quoting *Hegenes v. State*, 328 N.W.2d 719, 721 (Minn. 1983)).[9] We therefore conclude that at the second step of our three-part analysis in this workers' compensation case, our inquiry must focus on whether the legislature could reasonably have believed in any facts that would support the connection between the PTD thresholds and the employability of injured workers.

With the precise nature of our inquiry now defined, we turn to the history of the statute in question. Before the 1995 amendments that created the PTD thresholds in section 176.101, subd. 5(2), a worker could establish that he was permanently and totally disabled either by (1) proving that he had one of the five impairments now set forth in subd. 5(1); or (2) proving that he sustained an injury that "totally and permanently incapacitate[d]" him "from working at an occupation which brings [him] an income." The pre–1995 version of the statute defined "totally and permanently incapacitated" to mean

> that the employee's physical disability, in combination with the employee's age, education, training, and experience, causes the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income.

Minn.Stat. § 176.101, subd. 5(2)(b) (1994). This multi-factored approach to establishing eligibility for PTD benefits represented a codification of our holding in *Schulte v. C.H. Peterson Constr. Co.*, 278 Minn. 79, 83, 153 N.W.2d 130, 133–34 (1967) and other cases. Thomas L. Johnson & Catherine J. Wasson, *The* Minnesota Workers' Compensation Act: Amendments by the 1995 Legislature, 22 Wm. Mitchell L.Rev. 1493, 1499 (1996).

Implicit in the pre–1995 definition of "totally and permanently incapacitated" as set forth above is the idea that age and educational attainment affect an injured worker's wage-earning capacity. Similarly, the definition reveals the legislature's belief that the nature and extent of a worker's physical impairment is a relevant factor in determining his employability. When viewed from a deferential perspective, the effect of the PTD thresholds now codified at section 176.101, subd. 5(2)(a)-(c), is simply to formalize these factors—age, educational attainment, and nature and extent of physical impairment—to facilitate objectivity in the awarding of PTD benefits and, potentially, to achieve other purposes such as cost containment and

---

9. Importantly, we give great deference with respect to tax classifications despite articulating the three-prong Minnesota rational basis test as the applicable standard in tax cases.

See, e.g., *Council of Indep. Tobacco Mfrs.*, 713 N.W.2d at 308; *Rio Vista Non–Profit Housing Corp. v. County of Ramsey*, 335 N.W.2d 242, 245–46 (Minn.1983).

reduction of litigation. This deferential perspective supports a conclusion that the PTD thresholds are not arbitrary but are instead reflective of genuine and substantial distinctions among injured workers in terms of their employability.

We acknowledge that a more searching analysis might cast doubt on the extent to which the thresholds reflect the relative employability of the workers among whom they distinguish. For example, insofar as the thresholds represent an attempt to formalize and make more objective the *Schulte* factors, they rely on PPD ratings as a rough proxy for physical impairment *affecting ability to work.* But it could be argued that the PPD ratings are not well suited to serve as such a proxy because the schedule approach that Minnesota uses to calculate the ratings focuses on functional loss of use, which is distinct from ability to work. *See* 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 80.05[7]-[9] (2007). In effect, the PPD rating schedule "presupposes that there is an abstract and uniform measure of 'disability' that is valid and fair for all persons, apart from their activities or occupations." Id. at § 80.05[9] ("What * * * does 'loss of use' of three fingers mean? Loss of use for what purpose? For typesetting or for unskilled labor?"). Moreover, the relationship between the PPD ratings and the actual or presumed ability to work is further attenuated by the inclusion of certain internal organ impairments in the PPD rating schedule that may have little or no conceivable effect on earning capacity. *See, e.g.,* Minn. R. 5223.0060, subps. 7.D and 7.E (assigning percentages of disability for impairment of the reproductive and urinary systems); *see also Metzger,* 59 Minn. Workers' Comp. Dec. at 238–39 (holding that an employee could, in order to meet the applicable PTD threshold, include among her ratable PPD impairments

a nonwork-related hysterectomy performed 25 years before her work injury).

In addition to raising the foregoing concerns, Gluba contends that the PTD thresholds use worker age in an arbitrary manner. Johnson and Wasson summarize the concern this way:

> Pursuant to the amended law, an employee with a fifteen percent PPD who was injured at age fifty will meet the threshold requirements. However, [an employee] with a fifteen percent [PPD] rating will not meet those requirements if he was injured at age forty-nine.

Johnson & Wasson, *supra,* at 1500. We acknowledge the inherent imperfection in a classification that denies PTD eligibility to a 49–year old worker while deeming a 50–year old worker eligible when the two are similarly situated in every other meaningful respect. But other legislative classifications are subject to the same criticism. *See, e.g.,* Minn.Stat. § 181A.04, subd. 1 (2006) (prohibiting employment of minors under the age of 14); Minn.Stat. § 171.04, subd. 1(1)(i) (2006) (indicating that a minor must be at least 16 years old in order to qualify for a driver's license); Minn.Stat. § 490.121, subd. 21d (2006) (setting a mandatory retirement age for judges). As Justice Oliver Wendell Holmes stated and we noted in *Hegenes,*

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or

logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark.

328 N.W.2d at 722 (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting)).

Based on the foregoing analysis, we conclude that Gluba has a colorable argument that the PTD thresholds set forth in section 176.101, subd. 5(2), are poor determiners of impaired wage-earning capacity in the contemporary era. But in light of the deference we give when applying rational basis review to classifications affecting the distribution of economic benefits, we are unable to conclude that the legislature could not reasonably have conceived of any factual basis for conditioning PTD eligibility on a combination of age, educational attainment, and PPD ratings. We note that age and educational attainment are longstanding factors in assessing PTD, *see Schulte,* 278 Minn. at 83, 153 N.W.2d at 133–34, and—as indicated in the dissent in *Metzger*—legislators could have reasonably believed that "injured workers with a higher [PPD] rating are more likely to be permanently and totally disabled than injured workers with lower [PPD] ratings." 59 Minn. Workers' Comp. Dec. at 242 (Pederson, J., dissenting).

*Do subdivision 5(2)'s classifications effectuate the purpose of the law?*

The purpose of the Workers' Compensation Act as a whole is to "assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers who are subject to [the Act]." Minn.Stat. § 176.001 (2006). Within the broader framework of the Workers' Compensation Act, the purpose of section 176.101, subds. 4–5, is to provide wage loss benefits to employees who are permanently and totally disabled as defined by the legislature. The legislature's reasons for amending section 176.101, subd. 5, to add the PTD thresholds are not expressly stated in the amending legislation, but the parties offer a number of theories. Gluba contends that reducing costs for employers subject to the Act was the legislature's primary aim—a contention amicus shares. The employer and its insurer do not deny that reducing costs played a role in the legislation's enactment. They also assert that the legislature may have sought to make the criteria for PTD eligibility more objective, thereby achieving the Act's ultimate purpose of quickly and efficiently delivering benefits to injured workers.

We have indicated that any of the foregoing purposes may be legitimate:

> In passing the 1983 amendments [to the Workers' Compensation Act], the legislature attempted to decrease costs, avoid benefit stacking, reduce litigation, reduce the need for reliance on often conflicting medical testimony, and promote objectivity, consistency, and more uniform results in workers' compensation decisions. These would appear to be legitimate legislative objectives.

*Schmidt v. Modern Metals Foundry, Inc.,* 424 N.W.2d 538, 541–42 (Minn.1988). Presumably, such purposes are only legitimate to the extent that they do not undermine the fundamental balance the Workers' Compensation Act strikes between workers' interests on the one hand and employers' interests on the other. More specifically, the legislature could take many steps to reduce employers' costs, but if these steps resulted in the denial of benefits to a sufficiently large proportion of workers who incur severe economic hardship as a consequence of work-related injuries, the workers' compensation scheme would no longer represent "a reasonable trade-off" of workers' common-law tort rights for

statutory remedies under the Act. *See Schmidt,* 424 N.W.2d at 540–41.

As one recent commentator stated concerning attempts by state legislatures to reduce workers' compensation costs:

> To the extent that [cost-reduction measures] significantly * * * heighten the levels of disability necessary for recovery * * * and generally lower the benefits available to workers, these [measures] give rise to questions concerning their effect on the exclusive remedy shield included in the quid pro quo that supports the workers' compensation system. As employee benefits continue to decrease, at some level, the quid pro quo is thrown out of balance and employer protection from tort liability can no longer be justified.

Easton W. Orr, Jr., Note, *The Bargain is No Longer Equal: State Legislative Efforts to Reduce Workers' Compensation Costs Have Impermissibly Shifted the Balance of the Quid Pro Quo in Favor of Employers,* 37 Ga. L.Rev. 325, 329–30 (2002) (footnotes omitted).

It could reasonably be argued that the PTD thresholds in section 176.101, subd. 5(2)(a)-(c), promote objectivity and uniformity in workers' compensation decisions, thereby effectuating the ultimate purpose of the Workers' Compensation Act by assuring quick and efficient delivery of benefits. It could also be argued that the thresholds keep costs reasonable for employers, which is an express purpose of the Act. The more difficult question is whether the speed, efficiency, and cost reduction that result from the thresholds are achieved by forcing workers who are no longer employable as a result of work-related injuries to seek public assistance, relief from private charities, or other forms of support outside the workers' compensation system. Such a consequence would undermine the system's central pur-

pose and design. *See* 1 Larson & Larson, *supra,* § 1.04[2] (noting that the American workers' compensation system is designed such that "the consumer of a particular product ultimately pays the cost of compensation protection for the workers engaged in its manufacture"); *see also Franke v. Fabcon, Inc.,* 509 N.W.2d 373, 376 (Minn.1993) ("Workers' compensation * * * is social legislation, providing a measure of security to workers injured on the job, with the burden of that expense considered a proportionate part of the expense of production.").

On the record now before us, we are unable to definitively answer the difficult question set forth above and thereby determine whether the PTD thresholds "effectuate the purpose of the law." Moreover, this line of inquiry—while consistent with language we have used in other workers' compensation decisions—would implicate a stricter level of scrutiny than we believe is appropriate in the context of this case. Gluba has not established a record on which we could decide that the PTD thresholds undermine the ultimate purpose of the Workers' Compensation Act, and it is Gluba who bears the burden of proof on his constitutional claim. *See Westling,* 581 N.W.2d at 819 ("The party challenging the constitutionality of the statute bears the burden of establishing * * * that the statute violates a constitutional right."). For this reason and the other reasons set forth above, we hold that Minn.Stat. § 176.101, subd. 5(2), does not violate Gluba's right to equal protection under the U.S. Constitution or the Minnesota Constitution.

Affirmed.