Shannon Rae MURPHY, Relator,

v.

**COMMISSIONER OF HUMAN SERVICES, Respondent (A08–1042),**

**Minnesota Commissioner of Health, Respondent (A08–1148).**

Nos. A08–1042, A08–1148.

Court of Appeals of Minnesota.

May 5, 2009.

Charles H. Thomas, Mankato, MN; and Lindsay W. Davis, Southern Minnesota Regional Legal Services, St. Paul, MN, for relator.

Lori Swanson, Attorney General, Cynthia Beth Noren Jahnke, Audrey K. Manka, Assistant Attorney Generals, St. Paul, MN, for respondents.

Considered and decided by PETERSON, Presiding Judge; KLAPHAKE, Judge; and BJORKMAN, Judge.

## OPINION

PETERSON, Judge.

Relator challenges respondent commissioner's refusal to set aside her disqualification from providing direct-contact services to persons served by licensed facilities. Relator argues that disqualifying her based on the involuntary termination of her parental rights and refusing to set aside the disqualification without considering evidence that she poses no risk of harm constitutes an abuse of discretion and violates the Equal Protection, Due Process, and Remedies Clauses of the Minnesota Constitution. We reverse on equal-protection grounds and remand for reconsideration.

## FACTS

Relator Shannon Murphy's parental rights with respect to two children were involuntarily terminated in 1986. The termination order indicates that the termination was due to emotional problems that rendered relator "unable to parent either of [her] two children by herself." According to the termination order, these problems were caused by "emotional abuse by a male companion, which ... [relator] was unable to handle" and led to relator's psychiatric hospitalization.

In 2003, relator sought employment at several facilities that provided foster-care services to mentally ill adults and were licensed by the commissioner of human services under the Human Services Licensing Act, Minn.Stat. §§ 245A.01–.66 (2008). In connection with her employment applications, relator was investigated under the Department of Human Services Background Studies Act (BSA), Minn.Stat. §§ 245C.01–.34 (2008). Due to the 1986 termination of her parental rights, relator was initially disqualified "from any position allowing direct contact with persons receiving services" from these department-

licensed facilities.[1] Minn.Stat. §§ 245C.14, subd. 1, .15, subd. 1(a). But in 2003 and 2004, the commissioner had authority to set aside relator's disqualification,[2] and after considering information submitted by the affected licensed facilities and letters from relator's coworkers, the commissioner determined that relator posed no risk of harm to persons receiving adult-foster-care services and set aside relator's disqualification. During 2003 and 2004, the commissioner set aside relator's disqualification six times.

In 2005, the legislature amended the BSA to generally prohibit the commissioner from setting aside the disqualification of an individual disqualified due to an involuntary termination of parental rights. 2005 Minn. Laws ch. 136, art. 6, § 7, at 985 (codified as amended at Minn.Stat. § 245C.24, subd. 2 (2008)). As a result of this amendment, when a department-licensed facility submitted a background-check request that involved relator in 2007, the commissioner determined that relator "pose[s] an imminent risk of harm to persons receiving services" from that facility because of her 1986 termination of parental rights, and the disqualification could not be set aside. Consequently, relator was removed from direct contact with persons receiving services from the facility.

Relator requested reconsideration, citing the commissioner's previous determinations that she posed no risk of harm and the absence of any new facts suggesting otherwise. To support the request, relator attempted to present evidence of her lack of risk, including the facts and circumstances of the 1986 termination of her parental rights and various statements that vouched for her harmlessness. The commissioner affirmed the disqualification and explained:

> [Y]our immediate removal was not based on any new facts, but on the new law.
>
> ... [U]nder the current law, you have a permanent disqualification which the Commissioner no longer has the discretion to set aside. Thus, even if you have arguably demonstrated that you are not a risk of harm, the Commissioner cannot set aside your disqualification. Consequently, your affidavit and the numerous letters of support that you submitted from your previous employers are not relevant to your disqualification.

This certiorari appeal followed.

## ISSUE

■ Does the 2005 amendment to the BSA, which prohibits the commissioner from setting aside relator's disqualification from direct-contact employment, violate relator's right to equal protection under the Minnesota Constitution?

## ANALYSIS

■ Relator argues that permanently disqualifying her from providing direct-contact services to persons served by an adult-foster-care facility without the possibility of having the disqualification set aside violates her right to equal protection under the Minnesota Constitution. Evaluating a statute's constitutionality presents a question of law, which we review de novo. *Hamilton v. Comm'r of Pub. Safety*, 600 N.W.2d 720, 722 (Minn.1999). We presume that the statute is constitutional and exercise our power to declare the stat-

---

**1.** The commissioner of health is also named as a respondent in connection with a disqualification from working at a facility regulated by the department of health. Because it is the commissioner of human services who makes the disqualification decision under the BSA, we will refer only to the commissioner of human services.

**2.** Minn.Stat. § 245C.24, subd. 2 (2004).

ute unconstitutional "with extreme caution." *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 299 (Minn. 2000). We will not strike down a statute unless the challenging party demonstrates its unconstitutionality beyond a reasonable doubt. *Id.*

Under the BSA, when a current or prospective employee of a department-licensed facility will have direct contact with persons served by the facility, the commissioner of human services is required to conduct a background study on the employee. Minn.Stat. § 245C.03, subd. 1(a)(3) (2008). The commissioner shall disqualify an individual from direct-contact employment if a background study of the individual shows that (1) the individual has been convicted of, admitted to, or entered an *Alford* plea to a crime listed in section 245C.15; (2) a preponderance of the evidence indicates that the individual has committed an act or acts that meet the definition of any of the crimes listed in section 245C.15; or (3) there has been an administrative determination that the individual has (a) maltreated a child or a vulnerable adult, or (b) failed to make a statutorily required report of maltreatment for an incident in which recurring or serious maltreatment was substantiated. Minn. Stat. § 245C.14, subd. 1(a) (2008); *see* Minn.Stat. § 245C.15, subd. 4(b) (2008) (addressing maltreatment and failure to make report).

Generally, the length of time for which an individual is disqualified depends on what offense the individual committed. Section 245C.15 contains four subdivisions, which each include a list of criminal offenses. For offenses listed in subdivision 1(a), a disqualification is permanent; for offenses listed in subdivisions 2(a), 3(a), and 4(a), the disqualification periods are fifteen years, ten years, and seven years, respectively. Minn.Stat. § 245C .15, subds. 1(a), 2(a), 3(a), 4(a) (2008). Relator did not commit any criminal offense. But the list of criminal offenses in subdivision 1(a) is followed by a sentence that states, "An individual also is disqualified under section 245C.14 regardless of how much time has passed since the involuntary termination of the individual's parental rights under section 260C.301." Minn.Stat. § 245C.15, subd. 1(a). Also, the list of criminal offenses in subdivision 2(a) is followed by a paragraph that states: "For foster care and family child care an individual is disqualified under section 245C.14 if less than 15 years has passed since the individual's *voluntary termination of the individual's parental rights under section 260C.301, subdivision 1, paragraph (b), or 260C .301, subdivision 3.*"[3] Minn.Stat. § 245C.15, subd. 2(c) (emphasis added).[4] Because relator's parental rights were involuntarily terminated, she is permanently disqualified under section 245C.15, subd. 1(a).

---

**3.** Minn.Stat. § 260C.301, subd. 1(b) (2008), defines the nine statutory conditions under which the juvenile court may involuntarily terminate all rights of a parent to a child. Minn.Stat. § 260C.301, subd. 3 (2008), specifies conditions under which the county attorney is required to file a petition to terminate parental rights.

**4.** It is not apparent what the legislature meant when it referred to the "voluntary termination of the individual's parental rights under section 260C.301, subdivision 1, paragraph (b), or 260C.301, subdivision 3." Minn.

Stat. § 245C.15, subd. 1(c). A voluntary termination of parental rights occurs under Minn.Stat. § 260C.301, subd. 1(a), and requires "the written consent of a parent who for good cause desires to terminate parental rights." For purposes of this opinion, we assume that a voluntary termination under Minn.Stat. § 260C.301, subd. 1(b), occurs when a parent consents to the termination and good cause is established by proving the existence of one or more of the nine statutory conditions for an involuntary termination.

Under certain circumstances identified in chapter 245C, the commissioner may set aside a disqualification "if the commissioner finds that the individual has submitted sufficient information to demonstrate that the individual does not pose a risk of harm to any person served by the applicant, license holder, or other entities...." Minn. Stat. § 245C.22, subd. 4(a) (2008). If a disqualification is set aside, "the disqualified individual remains disqualified, but may hold a license and have direct contact with or access to persons receiving services." Minn.Stat. § 245C.22, subd. 5 (2008). The commissioner may rescind a set-aside if new information indicates that the disqualified individual may pose a risk of harm to persons served. Minn.Stat. § 245C.22, subd. 6 (2008). Depending on the reason why an individual was disqualified, the commissioner may be barred from setting aside the disqualification for seven years, ten years, or permanently. Minn. Stat. § 245C.24, subds. 2–4 (2008).

Before 2005, the statute that permanently barred the commissioner from setting aside a disqualification stated:

The commissioner may not set aside the disqualification of an individual in connection with a license *to provide family child care for children, foster care for children in the provider's home, or foster care or day care services for adults in the provider's home*, regardless of how much time has passed, if the provider was disqualified for a crime or conduct listed in section 245C.15, subdivision 1.

Minn.Stat. § 245C.24, subd. 2 (2004) (emphasis added).

Although relator was disqualified because of the involuntary termination of her parental rights, which is conduct listed in section 245C.15, subdivision 1, this statute did not permanently bar the commissioner from setting aside relator's disqualification because the permanent bar applied only to an individual working in a facility licensed "to provide family child care for children, foster care for children in the provider's home, or foster care or day care services for adults in the provider's home," and relator did not work in any of those types of facility; she worked outside her home in facilities that provided foster-care services for mentally ill adults.

But in 2005, the legislature amended Minn.Stat. § 245C.24, subd. 2, by striking the phrase, "to provide family child care for children, foster care for children in the provider's home, or foster care or day care services for adults in the provider's home," and making other changes. 2005 Minn. Laws ch. 136, art. 6, § 7, at 985; 2005 Minn. Laws 1st Spec. Sess. Ch. 4, art. 1, § 39, at 2488. The statute now states, "[T]he commissioner may not set aside the disqualification of any individual disqualified pursuant to this chapter, regardless of how much time has passed, if the individual was disqualified for a crime or conduct listed in section 245C.15, subdivision 1." Minn.Stat. § 245C.24, subd. 2(a) (2008).[5] As a result of these amendments, the permanent bar to setting aside a disqualification applies to an individual disqualified due to a crime or conduct listed in section 245C.15, subd. 1, regardless of the type of licensed facility where the individual provides services, which means that the commissioner is now permanently barred from setting aside relator's disqualification. Relator argues that permanently barring the commissioner from setting aside her dis-

5. In 2006, the legislature again amended Minn.Stat. § 245C.24, subd. 2, to allow the commissioner to set aside the disqualification of a chemical-dependency worker. 2006 Minn. Laws ch. 264, § 10, at 891. That exception to the permanent bar does not apply to relator.

qualification violates her right to equal protection. We agree.

■■■ "Equal protection is an inherent but unenumerated right found and confirmed in Minnesota's state constitution." *Hawes v.1997 Jeep Wrangler,* 602 N.W.2d 874, 880 (Minn.App.1999) (quotation omitted). Like the federal constitution's Equal Protection Clause, Minnesota's constitution requires that the law treat people in similar circumstances similarly. *Id.* To determine whether a statutory classification violates equal protection, we must consider (1) the classification's character, (2) the individual interests affected by the classification, and (3) the governmental interests asserted in support of it. *LaFreniere–Nietz v. Nietz,* 547 N.W.2d 895, 899 (Minn. App.1996).

■■■ Because the disqualification scheme in the BSA does not directly and substantially interfere with a fundamental right nor involve a suspect classification, we review it under the rational-basis standard. *See Gluba by Gluba v. Bitzan & Ohren Masonry,* 735 N.W.2d 713, 721 (Minn.2007) (stating standard of review). This standard requires us to determine "whether the challenged classification has a legitimate purpose and whether it was reasonable for the legislature to believe that use of the challenged classification would promote that purpose." *Id.* (quotation omitted). Unlike the federal equal-protection analysis, however, when considering an equal-protection claim under the Minnesota Constitution, we are "unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires." *Id.* (quotations omitted). In Minnesota, courts "have required a reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals." *State v. Russell,* 477 N.W.2d 886, 889 (Minn.1991).

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Gluba,* 735 N.W.2d at 721 (quotations omitted).

The BSA's overarching purpose is to protect the children and vulnerable adults who are served by licensed facilities. *See* Minn.Stat. §§ 245C.22, subds. 3 (requiring commissioner, in reconsidering a disqualification, to "give preeminent weight to the safety of each person served by the license holder"), 4(a) (authorizing disqualification set-asides for individuals who demonstrate that they "do[ ] not pose a risk of harm" to the persons served), .24, subd. 1 (authorizing commissioner to extend disqualification that would otherwise expire "if the individual continues to pose a risk of harm to persons served by that individual") (2008); *Sweet v. Comm'r of Human Servs.,* 702 N.W.2d 314, 319 (Minn.App.2005) (Minn. Nov. 15, 2005) (noting the state's "legitimate interest in protecting vulnerable adults from sex offenders" disqualified under the BSA). The BSA attempts to achieve this purpose by identifying and disqualifying individuals whose past behavior suggests that placing them in direct contact with children or vulnerable adults poses an unacceptable risk of harm.

When identifying past behavior that disqualifies an individual from direct-contact

employment, the BSA draws a distinction between individuals whose parental rights have been involuntarily terminated and individuals whose rights have been voluntarily terminated. An individual whose parental rights were involuntarily terminated is permanently disqualified under Minn.Stat. § 245C.15, subd. 1(a), from providing foster-care services to adults, and under Minn.Stat. § 245C.24, subd. 2(a) (2008), the commissioner may not set aside the disqualification. But an individual whose parental rights were voluntarily terminated is disqualified under Minn.Stat. § 245C.15, subd. 2(c), from providing foster-care services to adults for only 15 years, and the commissioner may set aside the disqualification if the individual does not provide adult-foster-care services in the provider's home. *See* Minn.Stat. §§ 245C.22, subd. 4, .24, subd. 4 (2008) (granting commissioner authority to set aside disqualification upon finding that individual does not pose a risk of harm but barring set-aside for seven years under specified criteria when foster-care services for adults are provided in the provider's home).

The commissioner argues that permanently disqualifying and not permitting a setaside for individuals whose parental rights were involuntarily terminated but not permanently disqualifying individuals whose parental rights were voluntarily terminated recognizes the substantial difference between the two groups' acceptance, understanding, and acknowledgment of their harmful conduct. The commissioner contends that an involuntary termination clearly demonstrates a reluctance to recognize and acknowledge that the nature of one's conduct has been harmful and damaging to the well-being, health, and safety of one's children.

But to accept the commissioner's argument, we would have to assume that what distinguishes a parent who contested a termination petition from a parent who agreed to a voluntary termination is that the parent who contested a petition did not recognize and acknowledge the accuracy and validity of the allegations in the petition while the parent who agreed to a voluntary termination accepted the petition as accurate and valid. The commissioner has not presented any basis for such an assumption, and we cannot imagine any basis for the legislature to believe that the fact that a parent contested a termination petition demonstrates that the parent simply did not understand the nature of the parent's alleged conduct. Nor can we imagine any basis for the legislature to believe that the fact that a parent voluntarily agreed to a termination of parental rights demonstrates that the parent accepted, understood, and acknowledged that the parent's conduct toward a child was harmful.

In theory, there is a difference between a voluntary and an involuntary termination of parental rights, but in actual practice, exactly the same conduct by a parent toward a child can lead to either a voluntary or an involuntary termination because of factors that have nothing to do with the parent's acceptance, understanding, and acknowledgment of the harmful nature of the conduct. A parent's resources for contesting a termination petition, the availability of witnesses and other evidence, and the parties' negotiating skills are just some of the factors that could cause what began as an involuntary termination proceeding to end in a voluntary termination of the parent's rights. *See, e.g., In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 712 (Minn.App.2004) (observing that "there are at least two procedures parents can utilize to convert an involuntary termination petition into a voluntary one").

Because there can be valid reasons why a parent contested a petition to terminate parental rights that do not indicate a lack of parental concern about a child's welfare, we reject the commissioner's argument that the contested nature of an involuntary termination proceeding is a valid basis for treating a parent whose rights were involuntarily terminated differently than a parent whose rights were voluntarily terminated. The state has a real and legitimate need to protect persons served by licensed facilities and a legitimate interest in efficiently disqualifying individuals who pose a risk of harm to those persons. But when determining whether an individual poses an unacceptable risk of harm to children or vulnerable adults, there is not a genuine and substantial distinction between individuals whose parental rights have been voluntarily terminated and individuals whose parental rights have been involuntarily terminated; the nature of a termination proceeding is not a rational basis for predicting the risk of harm. Therefore, we hold that to the extent that the BSA bars the commissioner from setting aside the disqualification of an individual whose parental rights were involuntarily terminated under circumstances where the commissioner could set aside the disqualification if the individual's parental rights had been voluntarily terminated, the BSA denies the individual the equal protection of the law.

### DECISION

Because the BSA violates relator's right to equal protection by prohibiting the commissioner from setting aside relator's disqualification under circumstances where the commissioner would not be prohibited from setting aside the disqualification if relator's parental rights had been voluntarily terminated, we reverse the commissioner's decision denying relator a set-aside without considering whether she po-

ses a risk of harm and remand for reconsideration.

**Reversed and remanded.**